# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

KYLE SLOAN, Individually, and
as Personal Representative of
the Estates of Rylie Sloan and
Jamie Sloan; KYLE SLOAN as
Surviving Spouse of Jamie
Sloan; KYLE SLOAN as Surviving
Parent of Rylie Sloan; SUSAN
WEST, Individually and as the
next friend and natural
guardian of K.W., a minor,

    Plaintiffs,

    v.

NICHOLAS BURIST; MAYFLOWER
TRANSIT LLC; JOE MOHOLLAND,
INC.; LOCKE RELATIONS LLC;
ALLSTATE FIRE AND CASUALTY
INSURANCE COMPANY; AND XYZ
COMPANIES 1-3,

    Defendants.

2:22-CV-76

---

THELMA PETNO,

    Plaintiffs,

    v.

NICHOLAS BURIST; LOCKE
RELATIONS LLC; MAYFLOWER
TRANSIT LLC; JOE MOHOLLAND,
INC.; PAYNE, INC.; AND XYZ
COMPANIES 1-3,

    Defendants.

2:23-CV-31

```
RAYMOND E. TIPTON,

     Plaintiffs,                          2:23-CV-33

     v.

NICHOLAS BURIST; LOCKE
RELOCATIONS LLC; MAYFLOWER
TRANSIT LLC; JOE MOHOLLAND,
INC.; PAYNE, INC.; AND XYZ
COMPANIES 1-3,

     Defendants.
```

```
MAKAYLA JANIA HINES,
Individually and as Personal
Representative of the Estate
of Michael Anthony Hines, Jr.,
Deceased,

     Plaintiff,

     v.                                   2:23-CV-89

NICHOLAS BURIST; LOCKE
RELOCATIONS LLC; NATIONAL
INDEMNITY COMPANY; MAYFLOWER
TRANSIT LLC; PAYNE, INC.; AND
XYZ COMPANIES 1-3,

     Defendants.
```

## ORDER

Before the Court is Defendant Mayflower Transit LLC's (hereinafter "Mayflower") motions for summary judgment filed in the four above-styled actions. See Sloan, 2:22-cv-76, Dkt. No. 290; Petno, 2:23-cv-31, Dkt. No. 184; Tipton, 2:23-cv-33, Dkt. No.

178; <u>Hines</u>, 2:23-cv-89, Dkt. No. 129. Because Mayflower's motions for summary judgment are substantively identical, the Court addresses all four motions in this single Order. After briefing and oral argument, these motions are ripe for review. <u>See generally</u> <u>Sloan</u>, 2:22-cv-76, Dkt. Nos. 290, 309, 315, 345-48; <u>Petno</u>, 2:23-cv-31, Dkt. Nos. 184, 194, 195, 202; <u>Tipton</u>, 2:23-cv-33, Dkt. Nos. 178, 188, 196; <u>Hines</u>, 2:23-cv-89, Dkt. Nos. 129, 139, 147. For the reasons stated below, the motions are **DENIED**.

### BACKGROUND[1]

These cases arise out of a July 1, 2022 traffic accident on I-95 in Camden County, Georgia, which resulted in multiple deaths and several hospitalizations. <u>See generally</u> <u>Sloan</u>, Dkt. No. 183; <u>Petno</u>, Dkt. No. 122; <u>Tipton</u>, Dkt. No. 115; <u>Hines</u>, Dkt. No. 72. These four suits were filed against several Defendants, including Mayflower, Joe Moholland, Inc. ("Moholland"), Locke Relations LLC ("Locke"), and semi-truck driver Nicholas Burist ("Burist").

## I. Overview of Defendants' Relationships

Mayflower, a subsidiary of UniGroup C.A., is an interstate carrier that facilitates government or military moves across state lines.[2] Dkt. Nos. 111-8 at 2; 290-9, J. Jones Dep., at 7, 24:23-

---

[1] Henceforth and unless otherwise noted, citations to the docket will be to the first-filed case, <u>Sloan v. Burist</u>, 2:22-cv-76.

[2] Mayflower obtains these moves, at least in part, from Total Military Management ("TMM"). Dkt. No. 290-9 at 18, 65:13-66:04. TMM "facilitate[s] the transaction between Mayflower and the government." <u>Id.</u> at 67:25-68:03.

25:06, 8, 25:21–26:02. Importantly, Mayflower is not the entity that actually "do[es] the moves." Dkt. No. 290-9 at 8, 25:06. Instead, Mayflower provides the authority for these moves to occur. This means that the moves are "done on Mayflower's [Department of Transportation ("DOT")] number," so Mayflower maintains the "driver qualification files," handles compliance requirements like driver drug testing and equipment file maintenance, provides excess insurance coverage on moves, and "compl[ies] with all of the federal regulations for interstate commerce." Id. at 9, 30:09–25.

To actually carry out these moves, Mayflower contracts with "agents that are independent companies." Id. at 8, 25:06–08. One of these agents was Moholland. Dkt. No. 290-2. Mayflower entered into an agency agreement with Moholland in 2008, and this agreement continued until January 19, 2022. Id. As the agency agreement neared its end, and in order to tie up ongoing business, Mayflower and Moholland entered into a temporary agency agreement that ran from January 20, 2022 until April 28, 2022. Id. at 9.

Moholland also has a contractual relationship with Locke. Dkt. No. 290-12, R. Garr Dep., at 16, 15:13–14. As a contractor of Moholland, Locke hauls shipments of household goods. Id. at 15:15–16. This "include[s] packing, loading, hauling, and delivery services." Id. at 15:16–18. In this arrangement, Locke provides Moholland with vehicles and employees (drivers), and, in return,

Moholland facilitates jobs and serves as a dispatcher for Locke. Dkt. No. 290-7, A. Locke Dep., at 6, 18:02-05. One of the drivers Locke provided to Moholland was Nicholas Burist, who indeed testified that he contracted driving work through Locke but "drove for Moholland." Dkt. No. 290-11, N. Burist Dep., at 14, 49:18-22, 17, 63:11-13. On July 1, 2022, Burist was driving the 2014 ProStar International tractor trailer involved in the accident giving rise to these cases. Dkt. No. 183 ¶ 9.

To summarize, Mayflower facilitates moves for the government or military via agents like Moholland. When Moholland obtains a moving job from Mayflower, it contracts with Locke to obtain the drivers, like Burist, and equipment needed to carry out the move. Moholland functions as the load dispatcher and the trucks that it uses, which are provided by Locke, operate under Mayflower's DOT authority.

## II. Agency Agreements and Lease Agreement

As discussed above, Mayflower and Moholland operated pursuant to an agency agreement. Dkt. No. 290-2. This agreement began in July 2008 and was terminated on January 19, 2022. Id.; Dkt. No. 290-1 at 3 (Mayflower letter acknowledging receipt of Moholland's agency termination). In conjunction with the agency agreement, Mayflower and Moholland entered into a lease agreement. Dkt. No. 346. Pursuant to the lease agreement and the accompanying equipment description addendum, Moholland provided Mayflower with "the use

5

of one or more items of motor vehicle and van equipment" and
"agree[d] to furnish [the] personnel" necessary "to perform
transportation services." Id. at 1-2. The equipment that Moholland
provided was "operated by Mayflower" in accordance with
Mayflower's "registration with the Department of Transportation
No. 125563, authorizing transportation as a motor carrier in
interstate or foreign commerce."[3] Dkt. No. 307-2 at 2. The lease
agreement also provides that Moholland agrees "to return all
licenses, cards, permits or other operating documentation of any
nature whatsoever issued in the name of [Mayflower]" within thirty
days of the agreement termination. Dkt. No. 346-2. The equipment
description addendum to the lease lists the unit number of the
truck that Burist was driving on the day of the collision. Dkt.
No. 307-2 at 2.

Though the parties operated under the agency agreement for
several years, dkt. no. 290-12 at 69, 59:04, they canceled the
agreement on January 19, 2022 because Moholland sold its company
to "a real estate company that [Mayflower] felt was a competitor."

---

[3] Although Moholland provided Mayflower with the truck for
shipments, the truck was owned by Locke. Dkt. Nos. 290-7 at 24,
91:19-23 (Angela Locke stating that Moholland never owned the
International truck that Locke purchased); 290-9 at 40-41, 156:20-
08 (Mayflower corporate representative Jason Jones stating that
the truck was not owned by Mayflower or UniGroup); 290-11 at 71,
280:14-20 (Burist stating that he understood Mr. Locke to be the
owner of the cab); 290-12 at 13-14, 12:24-13:03 (Rob Garr,
Moholland's president, stating that the vehicle was owned by
Locke).

Dkt. No. 290-8, C. Wynn Dep., at 33, 127:01-03; <u>see also</u> Dkt. No. 290-1 at 1-2 (January 19-20, 2022 emails between Chris Wynn, senior director at Mayflower, and Rob Garr acknowledging termination); <u>id.</u> at 3 (January 20, 2022 letter from Mayflower to Moholland acknowledging termination and discussing terms). After the January 19, 2022 termination date, Moholland became a "temporary agent" of Mayflower. Dkt. No. 290-4. This temporary agency agreement, which ran from January 20, 2022 until April 28, 2022, was enacted because "[w]hen Moholland was officially terminated [on] January 19th of 2022 as an agent for Mayflower, they still had shipments in the pipeline" and "[b]ecause there were active Mayflower shipments . . . [they] had to put together a Temporary Agent Agreement." Dkt. No. 290-8 at 7, 24:08-25. In other words, the temporary agreement was established to help "flush out stuff that's already registered in the [Mayflower] system." Dkt. No. 290-12 at 68, 67:14-18.

Under the temporary agreement, Moholland was authorized to carry out Mayflower shipments of "household goods moving in interstate commerce under [Mayflower's] bills of lading"[4] that had already "commenced" before the January 19, 2022 termination. Dkt.

---

[4] "A bill of lading is 'the basic transportation contract between the shipper-consignor and the carrier; its terms and conditions bind the shipper and all connecting carriers.'" <u>Norfolk S. Ry. Co. v. Groves</u>, 586 F.3d 1273, 1275 n.1 (11th Cir. 2009) (quoting <u>S. Pac. Transp. Co. v. Commercial Metals Co.</u>, 456 U.S. 336, 342 (1982)).

No. 290-4. In connection with the termination of the temporary agency agreement, the parties agreed that "[n]o later than 60 days beyond the effective termination date," all signage and branding associated with Mayflower or UniGroup C.A. was required to be removed from "all business, equipment, and physical facilities." Dkt. Nos. 290-1 at 4, 290-4 at 3, 290-8 at 34, 130:15–21. The temporary agreement terminated on April 28, 2022, so all Mayflower or UniGroup signage and branding was supposed to be removed by June 28, 2022. Dkt. No. 290-12 at 199–200, 198:25–99:08. However, at the time of the accident, those changes had not been made. Dkt. No. 309-1 (cease and desist letter sent on July 11, 2022 from UniGroup to Moholland requiring Moholland to stop using UniGroup "signage, marks, license plates"); 290-12 at 57–58, 56:13–57:15 (stating that the trucks were rewrapped by Labor Day 2022 and the delay of trucks "in queue" to get rewrapped was "[b]ecause it's a – that's a time-consuming process to get trucks rewrapped").

**III. Relationship At the Time of Accident**

At the time of the accident, Burist was driving a truck that displayed Mayflower's name and DOT number on its side. Dkt. Nos. 290-7 at 7, 21:19–24 (Angela Locke stating that she thought the DOT number on the truck on July 1, 2022 belonged to Mayflower); id. at 32, 122:12–123:08 (stating that "sometime after the accident" the DOT number on the truck was changed); 290-8 at 34, 129:11–14 (discussing a letter from UniGroup to Moholland stating

that it was aware Moholland was involved in an accident where UniGroup's DOT number was "prominent"); 290-9 at 32, 124:09-15 (Mayflower admitting that there was "no dispute" that "at the time of the collision" the truck had Mayflower's name and DOT number on it).

Additionally, on the day of the accident, the documentation and materials necessary for Burist to legally operate the truck were or or inside the truck. These items included an IFTA sticker,[5] a license plate provided by Mayflower, and a valid cab card that identified Mayflower as the "motor carrier for safety" and that was "specific to Joe Moholland Moving JMM333 for the license plate that was on the truck driven by Nicholas Burist on July 1st, 2022." Dkt. Nos. 290-10 at 13, 48:17-21, 15-16, 56:12-57:09, 28, 108:17-109:01, 301-11 (IFTA documents).[6]

Important to the resolution of Mayflower's motions are certain emails exchanged between Moholland and Mayflower/Unigroup shortly before the accident; these emails concern when the materials that allowed Moholland to travel under Mayflower's

---

[5] IFTA stands for "International Fuel Tax Agreement" and is "a registration to pay fuel tax in the states that you run miles in." Dkt. No. 290-10 at 13, 48:09-16. The IFTA stickers and documents must be kept "in a cab that's accessible for compliance with law enforcement by the agents and the drivers." Id. at 48:17-21.
[6] Burist "would be sidelined" and unable to drive the truck if he was found to be operating it without the IFTA sticker, license plate, and cab card. Dkt. No. 345. IFTA stickers, the license plate, and the cab cards are necessary for the truck to lawfully travel in interstate commerce. Id.

authority had to be returned. In May 2022, shortly after the
temporary agency agreement ended, Michael Peters, Vice President
of Operations for Moholland, responded to an inquiry from Diane
Lopez, Permit Coordinator at UniGroup, about returning the license
plates and stated, "Diane, We were told we could keep the plates
until they expire on 2023." Dkt. No. 337-1 at 20. In response,
Diane Lopez re-asserted her request for the plates to be returned.
Id. Mr. Peters replied, "Diane, It was agreed we could keep them
and run under them until they expire in 2023, we are not returning
them until then." Id. at 19. Ultimately, Nicole Crum, a Safety
Manager from UniGroup, contacted Mr. Peters and stated that the
license plates had to be received by June 15, 2022 or Mayflower
would "delete the plates from Missouri and report the plates as
stolen" in order to "prevent Mayflower from being charged any
citations, tolls, or CSA [(Compliance, Safety, Accountability)]
violations." Id. at 18.

Roughly one month later, on June 28, 2022, Mr. Peters reached
out to Ms. Crum to update her on Moholland's progress with
returning the license plates. Dkt. No. 336-1. He explained that
Moholland's new "IRP/IFTA" account would not be operational for
four to six weeks and, as a result, Moholland could not register
twelve "units" until that time had passed. Id. To bridge the gap,
Mr. Peters requested an extension of time within which to use
Mayflower's plates for those twelve units, including Unit 251-

0333, the trailer involved in the subject accident on July 1, 2022. Id. Ms. Crum contacted Adam Petry, Senior Manager of Safety Administration at UniGroup, to inform him that Moholland was requesting an extension on specific plates because "they say they can't get plates until their IRP and IFTA accounts are set up." Id. She further stated, "My concern is that so much can happen and come back to us *the longer we keep letting them use our plates*. We have already had some tolls and as you know from Steve's dealing, a roadside inspection that wasn't good at all." Id. (emphasis added). Still, on that same day, Mr. Petry emailed Rob Garr, President of Moholland, and authorized use of the plates until July 1, 2022. Dkt. No. 337-1 at 16. He wrote:

> Good Afternoon Rob,
>
> Mike Peterson from your office reached out to us this morning asking for an extension to return the base plates for 12 units.
>
> After checking with legal, I am sorry to inform that we cannot grant another extension *past this Friday 07/01*. We will need confirmation that these will be sent back on or before Friday otherwise legal will need to be involved.
>
> Thank you,
>
> Adam Petry

Id. (emphasis added).

Thus, contrary to the initial communications that required the plates to be returned by June 15, 2022, Mr. Petry's email states that Moholland need not return the plates until Friday,

July 1, 2022 at the latest. Notably, Mayflower did not take any legal action against Moholland or report the plates or IFTA stickers as stolen when they were not returned by the June 15, 2022 deadline nor after the later July 1, 2022 deadline. M. Kratzer Dep., Dkt. No. 290-10 at 18, 64:11-25 ("Q: [D]id Mayflower take any legal action against Joe Moholland between May 19, 2022, and July 1st, 2022, the day of this wreck, to prevent Moholland from keeping those plates that were registered in the name of Mayflower as a responsible motor carrier for safety? . . . A: Again, not that I know of."); id. at 65:13-18 ("Q: Okay. And did Mayflower ever report those license plates as stolen? A: I don't believe we're allowed to. Q: So that's a no? A: That is a no."), 19, 72:05-08 ("Q: And I think you told me before, the license plates and the IFTA stickers were never reported as stolen either, correct? A: Correct."). Furthermore, Michael Kratzer, one of Mayflower's corporate representatives, testified that he could not identify any correspondence with the Missouri Department of Transportation or Federal Motor Carrier Safety Administration stating that Moholland was not authorized to use Mayflower's license plates or other authority on July 1, 2022. Id. at 16, 57:10-25. Indeed, it was not until July 5, 2022, four days *after* the accident, that Mayflower contacted the Federal Motor Carrier Safety Administration to state that Moholland was not authorized to use

the plates. Id. at 18, 66:01–05. Of course, the accident happened on July 1, 2022.

## IV.  The July 1, 2022 Truck Load

As discussed above, at the time of the accident, the truck involved in the collision had Mayflower's license plates and IFTA stickers on it as well as the cab card inside it. However, materials relating to the load being carried do not implicate Mayflower. For instance, the Bills of Lading make no reference to Mayflower. Dkt. No. 290-3 at 1–2. Moreover, Rob Garr testified that Mayflower was not paid for the July 1, 2022 shipment because "the shipment was hauled under Joe Moholland's authority." Dkt. No. 290-12 at 67, 66:02–15. So, too, Jason Jones, another Mayflower corporate representative, testified that the company was not paid for the July 1st shipment, nor was the move recorded in the Mayflower mainframe system to reflect that it was being carried under Mayflower's authority.[7] Dkt. No. 290-9 at 10, 33:04–35:11.

## V.  Procedural Background

Plaintiffs filed suits individually in this Court following the accident and asserted claims for, *inter alia*, negligence against Burist, Moholland, Mayflower, UniGroup, and Locke,

---

[7] Jones stated that it is possible for Mayflower agents to "complete a load transfer that was not put into the mainframe," but that those loads were "done under their authority and outside of their relationship with Mayflower." Dkt. No. 290-9 at 10, 34:01–11. He was not aware of any move where "Mayflower was involved and got some payment or renumeration[,]" but the move was not recorded in the mainframe. Id.

negligent hiring, training, and supervision against Moholland, Mayflower, UniGroup, and Locke, punitive damages against Burist, Mayflower, UniGroup, Moholland, and Locke, and a claim against Mayflower for vicarious liability as a statutory employer under the Federal Motor Carrier Safety Regulations. See generally Sloan, Dkt. No. 183; Petno, Dkt. No. 122; Tipton, Dkt. No. 115; Hines, Dkt. No. 72.

On February 11, 2025, Mayflower filed a motion for summary judgment in each of the related suits. Sloan, Dkt. No. 290; Petno, Dkt. No. 184, Tipton, Dkt. No. 178; Hines, Dkt. No. 129. Plaintiffs responded and Mayflower replied. Sloan, Dkt. Nos. 309, 315; Petno, Dkt. Nos. 194, 202; Tipton, Dkt. Nos. 188, 196; Hines, Dkt. Nos. 139, 147.

## LEGAL AUTHORITY

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" where the evidence would allow "a reasonable jury to return a verdict for the nonmoving party." FindWhat Inv. Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A fact is "material" only if it "might affect the outcome of the suit under the governing law." Id. (quoting Anderson, 477 U.S. at 248). The Court must view all facts in the light most

favorable to the non-moving party and draw all inferences in its favor. Tolan v. Cotton, 572 U.S. 650, 657 (2014).

The movant bears the initial burden of demonstrating the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The movant must show the Court that there is an absence of evidence to support the nonmovant's case. See id. at 325. If the movant discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. See Anderson, 477 U.S. at 257. The nonmovant may satisfy this burden in one of two ways. First, the nonmovant "may show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was 'overlooked or ignored' by the moving party, who has thus failed to meet the initial burden of showing an absence of evidence." Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1116 (11th Cir. 1993) (quoting Celotex Corp., 477 U.S. at 332 (Brennan, J., dissenting)). Or second, the nonmovant "may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1117. However, the nonmovant must show more than "a mere 'scintilla' of evidence" to prevail. Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990). Thus, if the evidence presented by the nonmoving party is "merely colorable or is not significantly probative" then summary judgment

can be granted. <u>Anderson</u>, 477 U.S. at 249 (internal citations omitted).

## DISCUSSION

The outcome of Mayflower's motion for summary judgment turns on whether an agency relationship existed between Mayflower and Moholland on July 1, 2022. Georgia law provides three ways for an agency relationship to exist: (1) expressly, (2) by implication, or (3) through the principal's ratification of the agent's conduct.[8] <u>Burgess v. Religious Tech. Ctr., Inc.</u>, 600 F. App'x 657, 660–61 (11th Cir. 2015) (first citing O.C.G.A. § 10-6-1; then citing <u>Beckworth v. Beckworth</u>, 336 S.E.2d 782, 785 (Ga. 1985)). "Express agency arises when the principal expressly grants the agent the authority to act on its behalf." <u>Id.</u> at 661. If there is no express agency, then "the [C]ourt may look to whether agency is implied by the circumstances." <u>Id.</u> (citation omitted). "[I]t has long been the Georgia rule that one who is a party to the relationship (the principal or agent) may testify as a fact as to the existence or non-existence of the relationship." <u>Nat'l Prop. Owners Ins. Co. v. Wells</u>, 304 S.E.2d 458, 459–60 (Ga. Ct. App. 1983) (citation and quotations omitted). Thus, "the denial of agency effectively pierce[s] the plaintiff[s'] pleadings and place[s] on [the]m the burden of showing the fact of agency." <u>Id.</u>

---

[8] The parties agree that Georgia law governs. Dkt. Nos. 290 at 14, 309 at 9 n.10.

16

at 460. Plaintiffs' failure to show facts supporting agency can result in a finding of summary judgment for the Defendant. Id.

Mayflower insists that it had no explicit agency relationship with Moholland at the time of the crash. Dkt. Nos. 290 at 14, 315 at 8. Conversely, Plaintiffs argue that Moholland, Burist, and Locke were all agents of Mayflower.[9] Dkt. No. 309 at 9. However, Plaintiffs have identified sufficient evidence in the record to demonstrate that there is a genuine dispute of material fact about whether Moholland was an agent of Mayflower at the time of the crash.

As Mayflower points out, there is evidence in the record to support its position that Moholland was not its agent at the time of the crash. Some may conclude that there is a significant amount of evidence supporting Mayflower's position. Specifically,

---

[9] One of Plaintiffs' arguments is that the original agency between Moholland and Mayflower was not properly terminated because Mayflower did not comply with the notice provision in it. Dkt. Nos. 290-2 at 8, 309 at 13 n.12. Plaintiffs offer no authority to suggest that they have the ability to enforce the agency contract when they were not parties to the agreement. Further, the notice provision states that notice is given "the day it is delivered personally" or by certified mail. Id. Plaintiffs do not explain how Moholland failed to give personal notice of the agency agreement termination when there are letters and emails in the record showing that Mayflower received notice from Moholland of the termination. Dkt. No. 290-1 at 3 (letter from Mayflower to Moholland stating that "Mayflower Transit acknowledges receipt of your January 19, 2022 email establishing the termination of the Agency Agreement"); id. at 1 (email from UniGroup to Moholland reflecting the same). That is, each party to the termination of the written agreement had notice of the termination because each actually participated in the termination. The termination of the written agreement was not unilateral.

Mayflower emphasizes that its contractual agency agreement with Moholland terminated on January 19, 2022. Dkt. Nos. 290-2 (initial agency agreement and subsequent amendments), 290-4 at 3 (temporary agency agreement). Further, Mayflower points out that the temporary agency agreement with Moholland, which "cover[ed] the shipments that Moholland had in the pipeline" before the January 19, 2022 termination date began on January 20, 2022 and ended on April 28, 2022, over two months before the crash giving rise to this suit. Dkt. Nos. 290-4 at 3, 290-8 at 35, 133:19-21, 345. Also ending on April 28, 2022 was Mayflower and Moholland's lease agreement that listed Mayflower as "operating" vehicle number 24-333 "pursuant to a lease agreement with Joe Moholland Moving." Dkt. No. 307-2 at 1. The terms of the lease state that the lease agreement "automatically terminate[s]" on the "date of termination" for the agency agreement between Mayflower and Moholland and provided that Moholland was to return the operating documents or pay a liquidated damages fee. Dkt. No. 346-1 at 3-4. Mayflower also argues that the specific details of the July 1, 2022 load supports that it did not have an ongoing agency relationship with Moholland at the time of the crash. Particularly, Mayflower highlights that it was not listed on the bills of lading for that load, dkt. no. 290-3, nor was it paid as part of the load, dkt. no. 290-12 at 67, 66:08-11. Also, Rob Garr testified that Mayflower did not have any involvement in the July 1, 2022

shipment. Id. at 202, 201:09-12. However, the Court cannot say that no evidence supports Plaintiff's contention that an agency relationship was in effect on the date of the crash. Perhaps the evidence supporting Plaintiff's position weighs less. At this stage, the Court's role is neither to weigh material evidence nor ignore it. The only role for the Court at this juncture is to recognize it.

Mayflower's argument presumes that absent an agency agreement memorialized by contract, no such relationship could exist. However, Plaintiffs point to several pieces of evidence in the record to support that, on the day of the crash, there is at least a question of fact about whether Mayflower and Moholland had some type of agency relationship. Critically, Plaintiffs point out that the truck involved in the collision on July 1, 2022 was carrying Mayflower's name and DOT number. Dkt. Nos. 290-7 at 7, 21:19-24; id. at 32, 122:12-123:08 (stating that "sometime after the accident" the DOT number on the truck was changed); 290-8 at 34, 129:11-14 (discussing a letter from UniGroup to Moholland stating that it was aware Moholland was involved in an accident where UniGroup's DOT number was "prominent"); 290-9 at 32, 124:09-15 (Mayflower admitted that there was "no dispute" that "at the time of the collision" the truck had Mayflower's name and DOT number on it). Moreover, the documentation necessary for Moholland and Burist to lawfully operate the truck was on or inside the truck at

the time of the accident. Dkt. No. 290-10 at 13, 48:17–21, 28, 108:17–109:01. This includes (1) a valid cab card that was specific to Moholland for the license plate on the truck Burist was driving and that identified Mayflower as the "motor carrier for safety," id. at 15, 54:12–25, (2) the Missouri license plate, id. at 15–16, 56:12–57:09, and (3) a 2022 IFTA sticker, id. at 13, 48:17–21, 28, 108:17–109:01, dkt. no. 301-11. Indeed, without a DOT number on the truck, an IFTA sticker, a cab card identifying the motor carrier, and a license plate connected to those authorizations, Mr. Burist would not have legally been able to drive the truck on the day of the collision. Dkt. No. 345.

Mayflower contends that this evidence is not enough to create a genuine material dispute on the question of agency because Moholland was supposed to have returned the materials before the date of the accident. Dkt. Nos. 290 at 9, 345. The agency and lease agreements and emails from May 2022 reflect that initially the license plate and related materials were expected to be returned prior to July 1, 2022. See, e.g., Dkt. No. 337-1 at 18 (stating the plates should be returned by June 15, 2022). In response, Plaintiffs direct the Court to subsequent emails between Moholland and Mayflower/UniGroup representatives reflecting that the required return date for these materials was pushed until July 1, 2022 despite Mayflower's awareness that Moholland intended to hold

onto the materials to "run under" them.[10] For instance, on June 28, 2022, Michael Peters, Vice President of Operations for Moholland, emailed Nicole Crum, Safety Manager with UniGroup, and asked for an extension on twelve units, including No. 251-0333, because Moholland's IRP/IFTA accounts were not yet valid so those trailers could not be registered to Moholland to operate in interstate commerce. Dkt. No. 336-1 at 1. Ms. Crum emailed Adam Petry about Moholland's extension request and noted her "concern is that so much can happen and come back to [Mayflower] *the longer we keep letting them use our plates.*" Id. (emphasis added). Still, on that same day, Mr. Petry told Moholland that Mayflower/UniGroup would not grant another extension to return the plates "*past* this Friday 07/01" and requested confirmation that the plates would be mailed back "*on* or before Friday." Id. (emphasis added). Thus, while perhaps it is clear that Moholland did not have permission to use the license plate, cab card, and IFTA sticker *after* Friday July 1, 2022, it is disputed whether *on* Friday July 1, 2022, Mayflower had

---

[10] Mayflower argues these emails reflect that it was demanding the return of the license plates and related materials, not authorizing Moholland to continue using them. Dkt. No. 345. A reasonable jury could very well believe that this is supported by the evidence. Yet, a reasonable jury could also conclude that the evidence supports the theory that Mayflower knew Moholland intended to use the materials to operate. Indeed, emails from Michael Peters to Diane Lopez in May 2022 reflect that Moholland intended to "keep the[] [plates] and run under them until they expire in 2023." Dkt. No. 337-1 at 19. So, too, in the June 28, 2022 email requesting the extension, Mr. Peters explains that Moholland wants to keep Mayflower's materials until Moholland's IRP and IFTA accounts are "operational." Dkt. No. 336-1 at 1.

"expressly grant[ed] [Moholland] the authority to act on [Mayflower's] behalf" by allowing Moholland to continue using the license plate, cab card, and IFTA sticker. <u>Burgess</u>, 600 F. App'x at 661. Accordingly, Plaintiffs have identified sufficient evidence in the record to show that a genuine dispute of material fact exists as to whether Mayflower created an agency relationship with Moholland by extending Moholland's authority to use the materials until July 1, 2022.[11]

## CONCLUSION

Mayflower's motion for summary judgment, dkt. no. 290, is hereby **DENIED**. As the Court details above, Plaintiffs identified sufficient evidence in the record to show that there is a genuine dispute of material fact about whether Moholland was acting as an agent of Mayflower at the time of the collision on July 1, 2022. The parties are **ORDERED** to file their proposed consolidated pretrial order by October 21, 2025.

---

[11] Mayflower argues that this view of the evidence must fail because the bills of lading reflect that the shipments were not going to arrive until July 5, 2022, and August 12, 2022. Dkt. No. 290-3 at 1-2. Mayflower's position presupposes that, for example, it would not have been possible for Burist to remove the license plate, cab card, and IFTA stickers from the truck after he finished driving on July 1, 2022 and place them in the mail that same day. Perhaps it is unlikely this would occur, but the Court cannot so speculate. It is an argument to make to the jury.

**SO ORDERED** this 27th day of August, 2025.

_____

HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA